IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| **OGDEN CITY REDEVELOPMENT AGENCY, et al.,**<br><br>　　　　**Plaintiff,**<br><br>vs.<br><br>**ONTARIO SPECIALTY CONTRACTING, INC., and LUMBERMENS MUTUAL CASUALTY COMPANY,**<br><br>　　　　**Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:06CV53DAK |

　　　　This matter is before the court on Defendants Ontario Specialty Contracting, Inc. ("OSC") and Lumbermens Mutual Casualty Company's Motion for Summary Judgment, and Plaintiff's Motion to Strike Declaration of Jon Williams.  The court held a hearing on these motions on February 27, 2008.  At the hearing, Plaintiff was represented by Donald L. Dalton and Defendants were represented by Matthew J. Beck and Edwin C. Barnes.  The court took the motions under advisement.  The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties, the arguments made by counsel at the hearing, and the law and facts relevant to the motions.  Now being fully advised, the court enters the following Memorandum Decision and Order.

**BACKGROUND**

This case is a contract dispute regarding demolition of the Ogden City Mall site. In 2001, Ogden City Redevelopment Agency ("Ogden") decided to demolish the Ogden City Mall. Ogden solicited bids for this work and awarded the demolition contract to Defendant OSC. OSC is a national demolition contractor.

OSC and Ogden entered into a demolition contract dated March 27, 2002 (the "Contract"), and OSC began work on the project in mid-2002. The Contract called for the following relevant scope of work:

> (a) Complete all work described on Exhibit A including removal of all footings, foundations, floors, porches, sidewalks, private sidewalks, debris of any kind, parking slabs, accessory structures, fences, trees and any junk or debris which may be present.
> * * *
> (d) All materials comprising part of any existing structure, including the foundation and footings must be removed from the site.

Exhibit A to the Contract is a plot map of the property, and the Phase I report referenced by the Contract provided:

> . . . Based on the fact that the Mall structure is planned for demolition, numerous items of concern were identified during the site inspection, which will require proper disposition prior to building demolition. The items of concern include: underground storage tank associated with emergency generator; numerous quantities of petroleum or hazardous chemicals (small containers to 55 gallon drums); mercury thermostats/lamps/thermometers; suspected PCB containing light ballasts; small quantities of household type chemicals/cleaning products; numerous elevators and other equipment with reservoirs containing various types o[f] oils or petroleum products; suspected and identified asbestos-containing materials. Because the mall structures are planned for demolition additional investigation will be required to determine locations and actual quantities of the identified items of concern, so

>that they may be removed and properly disposed of prior to
>building demolition. . .

It is disputed whether the removal of an existing underground storage tank ("UST") located on-site was included in OSC's Contract. The removal of the UST is not specifically stated but there is a reference to OSC following the Phase I Report. In any event, OSC did not remove the UST from the project site. The other "prior to demolition" specialty items were added into the Contract via Change Order #1 and, therefore, performed as part of OSC's scope of work.

The Phase I Report represented the structures to be "both steel frame and precast concrete with slab on grade foundations." After OSC had demolished the majority of the above-ground structure, it began to remove the building slab, foundations, and footings. As this work progressed, OSC began to encounter large blocks of unreinforced slurry concrete flowable fill located underneath some foundations and in other below-grade areas of the site. These flowable fill concrete blocks were of no specific or consistent shape or size and contained no reinforcing rebar and/or mesh.

During the project, the unreinforced slurry concrete materials were identified by a licensed engineer as non-structural materials which constituted replacement flowable fill. According to the engineer, "The flowable fill blocks were easily distinguishable from removed footing elements both by the greater dimension and absence of any reinforcing steel. The in place blocks did not show any signs of dowels, rebar or other structural elements that would have permitted any type of structural connection to overlying footing elements."

Ogden City's building inspector testified that the flowable fill blocks were originally

installed with the City's knowledge in lieu of the granular stone/sand fill specified in order to save the contractor money on labor required for the placement of stone/sand fill in compacted lifts.  These flowable fill blocks, however, were not specifically disclosed in the demolition contract documents.  Building Inspector John Saunders admitted in his deposition that he was aware of the existence of these flowable fill blocks throughout the site, but was never asked by Ogden City to review or comment on the demolition contract documents in advance of the project.

As a result of these unforeseen flowable fill blocks, OSC requested extra compensation for the additional costs it incurred.  After Ogden City approved the cost of $45/per cubic yard for removal, OSC and Ogden City both executed a change order dated April 7, 2003, to that effect.  Two days later, by letter dated April 9, 2003, Ogden City revoked the April 7 Change Order and took the position that these concrete blocks were not unforeseen and constituted a part of the building foundations.  OSC continued to expose the blocks that were actually encountered and interfered with its scope of work.  This work increased OSC's costs significantly.  In late May and early June 2003, the issues concerning these concrete flowable fill blocks came to a head because OSC began talking of walking off the job.

On June 27, 2003, the parties entered into Change Order #4 which is central to this dispute.  Change Order #4 increased the amount of OSC's contract by $90,000 and provided as follows:

> Approved cost for unforeseen conditions.  Flowable fill and miscellaneous debris was discovered during the demolition process that is outside the contracted scope of work. The attached site plan of completed work and work yet to be completed is marked as Exhibit A and made a part hereof by reference. As of the date of

> this Change Order as to past actions, performance and conduct, each party hereto hereby mutually agrees to hold the other party hereto harmless from any liability, claim, loss, damage or expense of any kind or nature associated with this contract including, specifically, claims for credit(s) or extra work due to damage, unforeseen conditions, contract requirements, scope of work, performance, specifications, or otherwise. It is the parties' intention that all past actions and disagreements and disputes regarding this Contract are settled and resolved.

Change Order #4 included an attachment which divided the site into a 2/3 area that the parties deemed "completed area" and a 1/3 area remaining to be completed. In the 1/3 area remaining to be completed, the attachment states "Fill to be removed as of 6/24/03."

OSC had measured the exposed blocks and arrived at $90,000 as the estimated cost to remove the known flowable fill blocks in the remaining 1/3 area to be completed. OSC contends that it only agreed to remove and process the blocks that were then uncovered and the blocks that interfered with the performance of the balance of its Contract work as it had done on the first portion of the site (which comprised approximately 2/3 of the site). Ogden, however, contends that it intended OSC to search for and remove all of the concrete flowable fill blocks so that the site would be completely clear of all such blocks.

Despite repeated requests for drawings identifying or quantifying the concrete flowable fill blocks located on site, Ogden never provided such information to OSC. After this case was commenced, Ogden disclosed drawings identifying these flowable fill blocks. Such drawings were allegedly found in a basement file room.

Ogden City's senior project manager, Kevin Ireland, testified that he was on-site daily and that his boss Scott Brown was on the job site multiple times a week until OSC left the site. The Building Inspector, John Saunders, was also on-site regularly.

On August 1, 2003, Ogden issued a letter to OSC stating:

> After a walk through and review of the aforementioned site, this letter will serve as our acceptance of the property and the work provided by Ontario Specialty Contracting. Per the contract and further discussions all items were completed as per the contract and additional work order changes.

Kevin Ireland acknowledged that he walked the site with and obtained the approval of his boss Scott Brown prior to sending this letter. Thereafter, Ogden paid OSC the full balance due under the Contract. On March 12, 2004, Ogden stated in writing that it had no disputes or claims with respect to the work performed by OSC.

Almost two years after full acceptance of the work and full payment to OSC, Ogden asserted a claim against OSC and its bonding company for the cost of removing further concrete flowable fill blocks encountered in the construction of a new shopping facility at the site. In addition, Ogden has requested damages: (1) for the removal of the UST; (2) the removal of certain fill materials placed by OSC which allegedly do not meet compaction requirements; and (3) the cost of fencing the project site. At the hearing on Defendant's motion, however, Ogden dropped its claim for fencing costs.

OSC has asserted a counterclaim which totals approximately $513,540. The basis of the counterclaim is the reasonable value of removing and processing the flowable fill blocks handled by OSC at the $45/cy rate quoted to and originally agreed upon by Ogden in the April 7, 2003 change order that Ogden later revoked. OSC argues that if Ogden is allowed to back-out of its release in Change Order #4 and written acceptance of the site as it now seeks to do, OSC should likewise be entitled to the full value of the work performed at the price Ogden originally agreed to pay.

## DISCUSSION

### Defendant's Motion for Summary Judgment

Defendants move for summary judgment on the entire Second Amended Complaint. All of Ogden's separate claims are pled as a single cause of action. The main dispute in this case focuses on Change Order #4. Ogden argues that Change Order #4 is ambiguous and summary judgment must be denied. Ogden relies on general contract interpretation law stating that in interpreting a contract, a court looks at each contract provision in relation to all the others "with a view toward giving effect to all and ignoring none." *WebBank v. American General Annuity Serv. Corp.*, 2002 UT 88, ¶¶ 18-20. Moreover, an ambiguity exists in a contract term or provision if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies. *Id.*

Change Order #4 approves additional costs to be paid to OSC because "flowable fill and miscellaneous debris was discovered during the demolition process that is outside the contracted scope of work." The Change Order then also provides as follows:

> As of the date of this Change Order as to past actions, performance and conduct, each party hereto hereby mutually agrees to hold the other party hereto harmless from any liability, claim, loss, damage or expense of any kind or nature associated with this contract including, specifically, claims for credit(s) or extra work due to damage, unforeseen conditions, contract requirements, scope of work, performance, specifications, or otherwise. It is the parties' intention that all past actions and disagreements and disputes regarding this Contract are settled and resolved.

Ogden's position is that Change Order #4 did not effect a "release" when it was signed. Ogden maintains that the release language in the document was conditioned on OSC's performance under Exhibit A of the Change Order and OSC's representation that the work of

removing the subgrade chunks of unreinforced concrete in the blue area of Exhibit A was "completed" and that the subgrade chunks of unreinforced concrete in the yellow area would be "removed as of 6/24/03."

Faced with a document containing similar release language to that at issue in this case, this court has previously held that a plaintiff's subsequent claims were barred. *Dean v. Pivotal Group*, 2006 U.S. Dist. LEXIS 40332 (D. Utah 2006). In *Dean*, the parties' agreement stated that "[Plaintiff] agrees to hold harmless [defendant] from any and all liability of every kind which may arise out of or in connection with participation in any activities at [defendant's facility]." *Id.* at *4. The Court held that the terms of the agreement were unambiguous and enforced the terms of such release dismissing plaintiff's claims against defendant. *Id.*; *see also American Towers Owners Assoc., Inc. v. CCI Mechanical, Inc.*, 930 P.2d 1182, 1185-86 (Utah 1996) (unambiguous release precludes future claims).

In this case, Change Order #4's language is similarly unambiguous. Although Ogden suggests that the court should read ambiguity or conditional language into the Change Order, no such ambiguity or conditional language exists. The express language of the Change Order states that it was effective immediately. It is basic contract law that a court may not read ambiguity into an agreement where none exists. *Castleglen, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1581 (10th Cir. 1993) ("An ambiguity in a contract cannot be created by the mere assertions of a party to it, and a contract is not rendered ambiguous by the mere fact that the parties may not agree on the proper construction of it.").

The court concludes that Ogden is bound to the language of the release. The present claims concerning materials that were expressly conceded in writing to be "unforeseen

conditions. . . outside the contracted for scope of work" and "settled and resolved" are barred by the language of Change Order #4. Not only did Ogden acknowledge that the conditions were outside of OSC's scope of work via Change Order #4, but in resolution of the dispute it released, at a minimum, any and all claims pertaining to the areas of the site Ogden City designated as "completed areas." The parties expressly stated that "It is the parties' intention that all past actions and disagreements and disputes regarding this Contract are settled and resolved." Such language evidences an accord and satisfaction posing a further bar to plaintiff's claims. *Cox Construction Co., Inc. v. State Road Commission*, 583 P.2d 85, 86 (Utah 1978) (stipulation stating that plaintiff's claims shall be compromised and settled acts as an accord and satisfaction barring all future claims); *see also Robison v. Hansen*, 594 P.2d 867 (Utah 1979) (compromise agreement and acceptance extinguishes further claims).

 Ogden argues that the northern 1/3 area of the site remaining to be completed at the time Change Order #4 was executed was not completed correctly. It is undisputed, however, that OSC completed the balance of the project in the same fashion as it had completed the southern 2/3 of the Project site which Ogden deemed complete and released. After inspection, Ogden expressly acknowledged in writing that all work was performed in accordance with the Contract terms and paid OSC in full. It is also undisputed that Ogden did not disclose drawings identifying these blocks at any point during OSC's work on the project.

 Similarly, Defendants argue that the court should dismiss the portion of Ogden's claim concerning the compaction of fill materials in an area of the site now known as Lot 10B. This constitutes $27,556.00 of Ogden's overall claim. Ogden alleges that OSC breached the contract by failing to fill certain spot footing areas with materials compacted to 95%. Although OSC

9

disputes Ogden City's allegation that this work was not performed as agreed, Lot 10B falls within the "completed areas" released by Change Order #4. This issue was identified by Ogden City in writing shortly before execution of Change Order #4 through a punch list where Ogden City was demanding a credit for this item and others. Change Order #4, executed only a few weeks later, expressly included "credits" demanded by Ogden City and was intended to "settle and resolv[e]" all disputes between the parties. As a result, Ogden City's claim which relates to the compaction issue is dismissed based upon the release of such claim under Change Order #4.

Defendants further contend that the Court should dismiss Ogden City's claim which concerns the UST located and struck by Ogden City after OSC's work was completed and accepted. The UST was buried under a parking lot in an area where OSC was only to dig 1-1.5 feet to strip pavement. Because of the shallow depth required to complete its work in that area, OSC did not encounter or disrupt the UST. $122,005.19 of Ogden City's overall claim relates to costs associated with removal, cleaning-up, and venting the UST.

The removal and disposal of the UST was not part of OSC's scope of work under the original Contract. OSC's scope of work was to demolish the structure – "(a) removal of all footings, foundations, floors, porches, sidewalks, private sidewalks, debris of any kind, parking slabs, accessory structures, fences, trees and any junk or debris which may be present; (d) all materials comprising part of any existing structure, including the foundation and footings must be removed from the site."

A UST is not a part of the structure or junk or debris. USTs are defined as "any one or combination of tanks (including underground pipes connected thereto) that is used to contain an accumulation of regulated substances, and the volume of which (including the volume of the

underground pipes connected thereto) is 10 percent of more beneath the surface of the ground." 40 C.F.R. § 280.12.  USTs are separate and discrete items.  If a UST is subject to removal, it is specifically identified and dealt with by specialty contracts and specifications which detail removal and disposal requirements in compliance with environmental laws.

The Contract provided that: "Demolition and removal of all improvements shall be in accordance with Ogden City Municipal Code.  Contractor hereby acknowledges receipt of a copy of the Phase I Environmental Report attached as part of Exhibit A and hereby agrees to follow the recommendations contained therein."  The Phase I Report referenced provided:

> . . . Based on the fact that the Mall structure is planned for demolition, numerous items of concern were identified during the site inspection, which will require proper disposition prior to building demolition. The items of concern include: underground storage tank associated with emergency generator; numerous quantities of petroleum or hazardous chemicals (small containers to 55 gallon drums); mercury thermostats/lamps/thermometers; suspected PCB containing light ballasts; small quantities of household type chemicals/cleaning products; numerous elevators and other equipment with reservoirs containing various types o[f] oils or petroleum products; suspected and identified asbestos-containing materials.  Because the mall structures are planned for demolition additional investigation will be required to determine locations and actual quantities of the identified items of concern, so that they may be removed and properly disposed of  *prior to building demolition*. . .
>
> There are several emergency generators utilized at the subject site (located at anchor structures), one of the emergency generators is fed by an unknown size underground storage tank.  The UST is not-regulated but will require draining, cleaning and removal prior to demolition of the mall.

The Phase I Report further stated:

> 7.1     Interview with Owner(s)
> Ms. Tammie Nalder Ogden City Business and Economic Development was interviewed by Ken Larsen the All-American environmental professional to obtain information indicating recognized environmental conditions in connection with the subject site.

| Question: | Tammie Nalde[r] |
|---|---|
| . . . | |

| Storage Tanks on site: | |
|---|---|
| AGT | NO |
| **UST** | **NO** |
| . . . | |

Prior to demolition, Ogden solicited quotes from specialty environmental firms for the performance of environmental work the Phase I Report indicated should be done prior to OSC's demolition work. Ogden obtained a direct quote from Eagle Environmental to perform seven of the eight items for $137,948. The quote was executed by Tammie Nalder on behalf of Ogden. However, rather than enter into a contract with Eagle Environmental directly, Ogden and OSC added certain portions of the environmental work into OSC's Contract through Change Order #1. Change Order #1 added into Ogden and OSC's contract all of the "prior to demolition" items were specifically quoted by Eagle Environmental except the removal of the UST. Change Order #1 was for the exact amount Eagle Environmental quoted to Ogden for this work. Eagle Environmental performed this work and was paid in full without any mark-up by OSC.

OSC argues that the UST removal was not a part of Change Order #1 because it was already OSC's obligation to conduct the removal as part of its original contract. OSC argues that Ogden's position that OSC was responsible for removal of the UST is inconsistent with its contemporaneous entry of Change Order #1 which added the other segments of the environmental work to OSC's Contract for an additional $137,948. OSC argues that this demonstrates that environmental remediation was not a part of the original contract.

While some of this extrinsic evidence can be construed to support each party's position, there is no language in the original contract requiring OSC to do environmental remediation as part of its demolition work. The language merely requires OSC to follow the recommendations of the environmental report in conducting the work assigned to it under the contract. The

removal of the UST was not identified a part of OSC's scope of work. OSC did not remove any USTs from the Project site. Ogden never questioned this, asked OSC if the UST had been removed, or requested any inspection of such work. Ogden added the other seven items into OSC's Contract, monitored the performance of the work, acknowledged in writing that OSC performed all work in accordance with the Contract, entered into a release of all past performance, accepted the site, and made full payment. Moreover, if the UST removal was part of OSC's scope of work as Ogden now contends, it was required to be performed "prior to demolition" and was released by Change Order #4. Accordingly, Ogden City's claim concerning the UST is dismissed.

## Plaintiff's Motion to Strike

Plaintiff contends that Jon Williams' Declaration contains impermissible legal conclusions, such as statements that "all items were completed as per the contract and additional work order changes." He also testified that the removal of the UST was "not added into OSC's Contract." Plaintiff argues that these statements are legal conclusions or arguments based on legal conclusions. The court has not relied on these statements in reaching analyzing the issue or reaching its own legal conclusions. Therefore, the court finds the motion to strike these statements moot.

In addition, Plaintiff asserts that Williams' Declaration also contains a number of conclusory statements for which no factual support has been provided and there is no basis for concluding that he had any first-hand, personal knowledge of the conditions. Williams, however, is the president of OSC and his Declaration puts forth the underlying facts based on his personal knowledge and involvement as well as the records of OSC. Defendants filed a supplemental

Declaration of Williams in connection with its opposition that lays some additional foundation for his knowledge. Although Ogden may disagree with portions of the Declaration, that is not a basis for striking such statements. Moreover, Ogden makes impermissible assumptions that Williams is relying on statements of employees, but does not provide any specific facts to support its motion to strike.

Furthermore, the business records referred to in the Declaration are not hearsay. But to the extent that statements in Williams' Declaration can be construed to be making speculative statements as to Ogden's intent, such statements lack foundation. The court has not relied on these statements in its decision.

## CONCLUSION

For the reasons stated above, Defendant OSC's Motion for Summary Judgment is GRANTED, and Plaintiff's Motion to Strike is DENIED IN PART and MOOT IN PART.

DATED this 27th day of March, 2008.

BY THE COURT:

_____
Dale A. Kimball,
United States District Judge